ROBERT R. POWELL, SBN: 159747
SARAH E. MARINHO, SBN: 293690
POWELL & ASSOCIATES
925 West Hedding Street
San Jose, California 95126
T: (408) 553-0201 F: (408) 553-0203
E: rpowell@rrpassociates.com

RACHEL R. RAYMOND, SBN: 269832
LAW OFFICES OF RACHEL R. RAYMOND
1151 El Centro Street, Suite D
S. Pasadena, CA 91030-5756
T: (626) 269-9490 F: (626) 639-3140
E: rachelrraymond@gmail.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

(Western Division)

| | |
|---|---|
| RACHEL SCANLON, individually and as Guardian Ad Litem for her minor children K.X. and G.X, STEVEN SAWYER,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>COUNTY OF LOS ANGELES, LOURDES OLARTE, MARISOL GONZALEZ,  ANGELA HASHIZUME, and Does 1-10,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**<br><br><br><br>**JURY TRIAL DEMANDED** |

1

Plaintiffs, STEVEN SAWYER, RACHEL SCANLON, individually and as Guardian Ad Litem for her children, Minor Plaintiffs K.X. and G.X ("Plaintiffs"), respectfully represent and allege as follows:

## I. <u>JURISDICTION / VENUE / CLAIM COMPLIANCE</u>

1.     Plaintiffs brings this civil rights lawsuit pursuant to 42 U.S.C. § 1983 to redress the deprivation by Defendants, whom Plaintiffs allege at all times during the events and circumstances described herein below were acting under color of state law, of rights secured to Plaintiffs under the United States Constitution, including the First, Fourth, and Fourteenth Amendments, and under federal law, including 42 U.S.C. § 671(a)(16), and California law where applicable as stated.

2.     This Court has jurisdiction over all causes of action asserted herein because all causes of action arise out of conduct undertaken by defendants in the State of California, County of Los Angeles.

3.     Venue properly lies in the United States Central District of California, in that the events and circumstances herein alleged occurred in the County of Los Angeles, and at least one Defendant resides in the County of Los Angeles.

4.     Plaintiffs K.X. and G.X. have complied and/or substantially complied with the State of California's tort claim notice procedures pursuant to G.C. 910, et seq, and allege that the minor Plaintiffs claim for intentional infliction of emotional distress included in this Complaint is properly included in compliance with the laws of the State of California.

5.     Plaintiffs K.X. and G.X. allege that their initial and timely compliance with said tort claim statutes occurred on March 28th, 2018, by the mailing on that date of the County of Los Angeles public website-provided, "Claims for Damages to Person Or Property."

6.   Said Claim form was fully completed, signed, and served by U.S. Mail on the address provided for submission of such claims on the face of the form, to wit, 500 West Temple Street, Room 383, Kenneth Han Hall of Administration, Los Angeles, Ca. 90012 on the 28th of March, 2018.

7.   The Claim form mailing was returned to the office of Plaintiffs' counsel on or about April 5th, 2018, in the original envelope but bearing a U.S. Postal Service notice, a small yellow sticker, indicating in the printed text thereon, "Return to Sender – Attempted – Not Known – Unable to Forward.

8.   On April 25th, 2018, Plaintiffs' counsel submitted a Request for Leave to File a Late Claim With The County, pursuant to G.C. 911.4.  The document contained as Exhibits the original claim form – with the address that matched the address on the original tort claim filing as evidenced by a copy of the letter returned by the U.S. Postal Service – and the original Proof of Service regarding the original tort claim form sent to the County.

9.   On May 4th, 2018, Carol Woods, Claim Specialist with Carl Warren & Company, sent a letter indicating the application for leave to present a late claim was denied "by operation of law," pursuant to G.C. 911.6., and indicating no further action would be taken.

10.   On May 14th, 2018, a letter was sent to Carl Warren & Company, advising them of the relevant section of the Government Code, 911.6, which makes the granting of the request to file a late claim mandatory as to a minor.  The language of the code section was included and highlighted by bold enhancement.

11.   Plaintiffs K.X. and G.X. allege they have substantially complied, and/or fully complied with the claim presentation requirements of G.C. 910, et seq., and that their state law based claim, as minors pursuant to G.C. 911.6, were timely made and granted by operation of law, and based thereon include their claim for Intentional Infliction of Emotional Distress pursuant to California law in this

3

Complaint.

12.   Plaintiffs further allege that at all times mentioned herein, the individual Defendants and each of them, were acting under color of state law, and pursuant to, or motivated by, the policies, practices, procedures and/or non-existent or inadequate training of the County of Los Angeles.

## II. PARTIES

**Plaintiffs**

4.   Plaintiff, Rachel Scanlon, ("Rachel" and/or "mother") was at all times relevant to the facts and circumstances herein an individual residing in the City of San Pedro, in the County of LOS ANGELES.

5.   Plaintiff, Steven Sawyer, ("Steven" and/or "father") was at all times relevant to the facts and circumstances herein an individual residing in the City of San Pedro, in the County of LOS ANGELES.

6.   Rachel and Steven are the natural and biological parents of minor children, K.X. (born 5/2008) and G.X. (born 3/2012).

7.   Plaintiffs K.X. and G.X. are minors under the age of 18, and they will be referred to at times herein as Minor Plaintiffs, minor children and/or children, as circumstances dictate.

8.   Prior to the involvement of the County of Los Angeles Department of Family & Children's Services ("DFCS") and the individual Defendants named herein below in the lives of the Plaintiffs, they enjoyed all of the love, mutual affection, and support of a normal familial relationship.

9.   An application for appointment of a Guardian Ad Litem, Rachel, to represent them in this matter is or will be made at or near the time of filing of the Complaint in this action.

10.   The minor children's names are reduced to initials in these pleadings in order to protect the children's privacy.  It is Plaintiff's intent to use this

4

designation unless and until such time the Court orders otherwise**.**

11.    At all times relevant herein, prior to the wrongful removal and continued detention of the children from adult Plaintiffs care by Defendants, Plaintiffs Rachel and Steven, raised, nurtured, provided guidance, and cared for the children, and from their parents the children received the parents nurturing care, comfort, unwavering physical and emotional support and love.

12.    At all times prior to the wrongful removal and continued detention of the children by Defendants, the family members enjoyed the company, society, and companionship, and the entirety of the panapoly of rights of familial association with each other, until such time as the involvement of DFCS by and through its employee Defendants named hereinbelow. At that time, in September of 2017, there commenced a proceeding in the County of Los Angeles' juvenile dependency division of the Superior Court of California involving this entire family; this proceeding will be referred to herein as the "juvenile case" and/or "juvenile matter" from time to time.

**Defendant County Of Los Angeles**

13.  Defendant COUNTY OF LOS ANGELES ("COUNTY") is a municipality in corporate form, organized and existing under the laws of the State of California. The Department of Children & Family Services ("DFCS") is a COUNTY governmental agency organized and existing pursuant to the law and policies of Defendant COUNTY, which together with COUNTY, promulgated, encouraged, and/or permitted the policies, practices, and customs pursuant to which the individual Defendants, and Does 1 – 10, committed the acts or omissions complained of herein, and of which policies, practices, customs, and/or procedures, and/or complete or inadequate failure to train, whether or not such policies, practices, and customs were promulgated in written form, encouraged, or allowed to persist by Defendant COUNTY.  COUNTY condoned, ratified, and

ignored without remediation the conduct of the individual social worker Defendants as such conduct is detailed and complained of herein.

14. Plaintiffs hereby sue all agencies and departmental units of COUNTY specified hereinabove under the designation of COUNTY herein, and/or interchangeably with DFCS at times.

15. As the employer of social workers and their supervisors, COUNTY and/or DFCS had primary responsibility for the training, education, and supervision of social workers, emergency response workers, dependency intake workers, placement workers, and all other DFCS personnel, and DFCS supervisors.

16. Plaintiff contends that the policies, practices and procedures of DFCS, as well as the non-existent or inadequate training of DFCS social workers as set forth hereinbelow, as well as DFCS' failure to take any remedial steps to change the culture of an agency which in the name of "child protection" routinely violates the constitutional rights of families, and ensnares them in the juvenile dependency system in the County of Los Angeles, were the moving force and/or causative factor behind the treatment of the Plaintiffs as alleged hereinbelow.

17. Plaintiffs have included herein, a Claim for Relief based on *Monell* liability of the COUNTY. The *Monell* liability of the COUNTY applies to each of the Claims for Relief alleged against the individual Defendant-employees set forth in this Complaint unless otherwise specified, as their actions and failures to act are the basis for the constitutional violations complained of herein under federal regulatory, statutory or decisional law.

18. Such *Monell* liability exists based on the following policies, practices, and customs, and are the result of those policies, practices or customs, but Plaintiffs are informed and believes and also includes no training or inadequate training to prepare social workers for recurring circumstances in cases of this nature that DFCS investigates and files Welfare & Institution 300 code-based Petitions upon

6

in the juvenile dependency court were a moving force behind the violations of constitutional rights complained of herein.

**Monell Claims**

19.   **(A)**  COUNTY has a policy, custom, or practice, of including false allegations, inflating and exaggerating partially true allegations into misrepresentations, and omitting facts and circumstances exculpatory to allegations, in the Welfare & Institutions Code 300 Petitions, and Applications for Warrants filed by social workers (and other juvenile court filings), which behaviors are done with social worker supervisor approval, and engaged in to support efforts to obtain judicial approval of otherwise unlawful removals of children and/or continue separation of children from their parent(s).

20.   In the juvenile dependency case involving these Plaintiffs, adherence to such policy, custom or practice manifested in the filing of the original W&IC 300 Petition, the application for a protective custody warrant to remove the children, and representations made and information withheld in subsequent "reports" and "Last Minute Information(s)" provided to the juvenile dependency Court during the juvenile case, each of which included materially false representations of fact and/or omitted material facts, as well as including half-truths. These falsehoods, misrepresentations, and omissions are set forth in further detail in the "Common Allegations" section of this Complaint.

21.   This nefarious conduct has persisted for decades with DFCS without remediation, discipline, or reprimand.

22.   Prior to the advent of actually knowing of the existence of protective custody warrants and learning about how to obtain protective custody warrants - rather than just removing children without a warrant – which were developments occurring in late 2010 with the COUNTY's initial warrant trainings - the fraudulent representations, omissions of exculpatory evidence and inclusion of

half-truths occurred in the first instance upon inception of a juvenile dependency case, which for purposes herein is reference to filing documents with the Court in the form of W&IC 300 Petitions and Detention Reports.

23.    However, after the advent of warrant training, the panapoly of fraudulent representations, omissions of exculpatory evidence and inclusion of half-truths were moved "forward," into the applications for protective custody warrants and often accompanying W&IC 300 Petitions, which are submitted on an ex-parte basis without advance notice to parents, and that practice, like all the other nefarious conduct aforesaid and to follow, continues to this day without remediation by COUNTY.

24.    **(B)**  COUNTY also has a policy, custom, or practice of using a department/unit known as the "IDC" unit for preparing Petitions, be they original Petitions for situations when children have or have not been detained, or situations where the Petition is submitted with or in association with a request for a warrant, and also when children have already been removed without a warrant.

25.    Pursuant to the COUNTY's policies, practices, and customs, the IDC worker is not required to do any personal investigation whatsoever or of any kind, into the claims and allegations leveled against the parent(s) in the Petition submitted to the Court.  These same circumstances of conducting no personal investigation of any kind, and additionally engaging in a routine practice of inflating and exaggerating allegations to create a leveraged situation for settlement discussions with parents (wherein there are increased opportunities to get the parent or parents to agree to "lesser" charges in exchange for submitting to continued jurisdiction by the Court and therefore DFCS involvement in the family's lives), occur as a matter of practice.

26.    Known cases involving all manner of DFCS social workers (Emergency Response, Dependency Investigator, IDC workers, etc…) inclusion of false

8

statements, misrepresentations and half-truths, the omission of material exculpatory or mitigating information in Applications for Protective Custody Warrants, W&IC 300 Petitions, Detention / Jurisdiction / Supplemental / Last Minute / Progress Reports, as happened in the juvenile case involving this family, also occurred in the cases of In re: Aeylias L. and Amalay L. (Superior Court Los Angeles, Case #CK86618),  In re: Angelo B. and Ione B. (Superior Court Los Angeles, Case #CK83235), In re: Adam A. and Kaitlyn H. (Superior Court Los Angeles, Case #CK71064), In re: Edward B. (Superior Court Los Angeles, Case #BD501338), In re: Shealy R., Angela V. and Edward B. (Superior Court Los Angeles, Case #LK05073), In Bryanna G. & Kathy G (Superior Court Los Angeles, Case #CK87119)  ??? Wenninger ???

27.    The inclusion of false facts, misrepresenting facts, and omitting facts favorable to the parents and/or contrary to the proposition a child[ren] should be removed or remain separated from the child[ren's] parents is an ingrained, widespread, unremediated practice in COUNTY, and the moving force behind the constitutional violations that were visited upon this family.

28.    These failed policies, practices, and customs, as well as the non-existent or inadequate training by the County, and utter failure to discipline or reprimand social workers for such deceitful and despicable behavior, constitutes deliberate indifference to the rights of family members to familial association and/or freedom from unreasonable seizures under the 14th and 4th Amendments to the U.S. Constitution.

29.    The IDC worker for the COUNTY, when preparing a Petition, is not even required to contact the actual investigating social worker, which fact has been confirmed in depositions in subsequent civil rights cases involving a number of the juvenile dependency matters cited above.

30.    The IDC worker then signs the Petition, which is signed pursuant to

9

penalty of perjury, despite no personal knowledge of a single alleged fact contained in the Petition; another aspect of the policy, practice, or custom confirmed in depositions in civil rights cases involving the juvenile matters cited above.

31.   The actual investigating social worker, usually the Emergency Response investigator who actually did first hand investigation of some sort, is not required to sign the Petition which is signed pursuant to penalty of perjury, and this is true for each of the juvenile dependency cases cited hereinabove.

32.   **(C)**  COUNTY has a policy, custom, or practice of conducting investigative interviews of minor children who are not the subject of any allegations of abuse or neglect, and doing so without the knowledge or consent of the children's parents, in violation of both the parents and the child's rights of privacy and familial association.

33.   The COUNTY has engaged in this policy, custom, or practice in the juvenile case involving this family, and in violation of the parents and G.X.'s constitutional rights of privacy, familial association, and against G.X.'s rights to be free from an unreasonable search and/or seizure.

34.   This policy, custom, or practice has also been found to exist in the following cases, all filed within the past five years in this Central District Court; *Guevarra v. County of Los Angeles*, Case No. CV14-08120 DDP (MANx), *Rouchon v. County of Los Angeles*, Case No. Unknown.

**Individual Defendant County Employees**

35.   Defendant LOURDES OLARTE, ("OLARTE") whose acts as alleged herein were performed in her individual capacity or as an employee of COUNTY and under color of state law, was at all times relevant herein a social worker employed with the COUNTY and the "Emergency Response" investigating social worker with regard to claims made of abuse and/or neglect of K.X. by her

10

parents Rachel and Steven.

36.   OLARTE submitted to the juvenile dependency court in the County of Los Angeles' Superior Court, and signed under penalty of perjury both the Detention Report and Warrant application described hereinbelow.

37.   Defendant MARISOL GONZALEZ, ("GONZLEZ") whose acts as alleged herein were performed in her individual capacity or as an employee of COUNTY and under color of state law, was at all times relevant herein a social worker supervisor of OLARTE, and a co-preparer and co-signator to the Detention Report described hereinbelow, as well as fully reviewing, supervising, encouraging, and ratifying the application by OLARTE of an application for protective custody warrant to remove K.X. and G.X. from their parents.

38.   Defendant MARISHA HARRIS, ("HARRIS") whose acts as alleged herein were performed in her individual capacity or as an employee of COUNTY and under color of state law, was at all times relevant herein a social worker who Plaintiffs are informed and believe, and thereon allege, was a participant and conspirator in the submission of the fraudulent warrant application discussed herein below, but whom Plaintiffs know due to Rachel's being present at the time, was the social worker that removed K.X. from her school on September 28th, 2017.

39.   Defendant ANGELA HASHIZUME, ("HASHIZUME") whose acts as alleged herein were performed in her individual capacity or as an employee of COUNTY and under color of state law, was at all times relevant herein a social worker employed with the COUNTY and the "IDC" social worker who prepared and signed the W&IC 300 Petition which included within the Petition, claims made of abuse and/or neglect of K.X. and G.X. by her parents Rachel and Steven.

**Doe Defendants**

40.   Plaintiffs are ignorant of the true names and capacities of those Defendants

sued herein as DOES 1-10, inclusive, and therefore sues them by such fictitious names. Plaintiffs will amend this Complaint to show the true names and capacities of said DOE Defendants when the same are ascertained and their roles in the actions/inactions, malfeasance/misfeasance, and conspiracy/ conspiracies alleged herein are known.

41.    Plaintiffs are informed and believes and, based upon such information and belief, allege that at all times herein mentioned, the individually named Defendants hereinabove, and Does 1-10, were each the agent of each other, and/or employees of their co-defendant COUNTY, and each of Defendants was acting within the scope, purpose, and authority of their employer, COUNTY, and with the knowledge, permission and consent of one or more of their co-defendants.

42.    Plaintiffs specifically allege that Defendants OLARTE and GONZALEZ conspired to submit the perjurious and fraudulent application for protective custody warrant, and to pursue the removal of G.X. even though they were fully aware there was not a single allegation, nor basis in fact, for the child being removed from her parents.

### III.    COMMON ALLEGATIONS

**Events Leading To Removal September 28, 2017**

43.    K.X. is a child born with autism. K.X. receives special instruction in school settings; she always has and she always will. Her autism lends itself to various negative, and occasionally harmful/self-injurious behavioral issues as well.

44.    K.X. was cared for in exemplary fashion by her parents Rachel and Steven her entire life, up to and past the removal of K.X. and her younger sister G.X. by GONZALEZ and OLARTE's ill-gotten, fraudulent, and therefore unlawful Protective Custody Warrant discussed below.

45.    Rachel and Steven were successful in their chosen career fields, well

Complaint
Scanlon, et al., v. County of Los Angeles, et al.
Case No.

educated, maintained a nice home, and always had quality health insurance for their family.  They kept K.X. enrolled in quality programs designed to maximize her educational and social interactive abilities to the fullest extent allowed by her autism.

**First Contact With OLARTE – September 15, 2017**

46.    OLARTE showed up at the Plaintiffs' house on September 15th, 2017, and told Rachel that she had received a referral regarding K.X. stating that she appeared intoxicated at school.

47.    At the time of this initial contact by OLARTE, she made clear she was talking only about one single alleged incident of any claim of K.X. appearing intoxicated or suffering from any condition / affliction.

48.    This "single" referral would grow, and three days later OLARTE and/or GONZALEZ told the adult Plaintiffs there were "three" different referrals on the same topic by the time the meeting with OLARTE and GONZALEZ on September 19th, 2017 (discussed below) was held.

49.    Rachel explained to OLARTE about K.X.'s autism and told OLARTE that her and her husband were currently treating K.X. with cannabis oil (THC) with a doctor's recommendation.

50.    Rachel gave her details about why K.X. was being treated with THC for her autism, including that there had been increasing volatile and self-injurious behaviors by her daughter over many months.

51.    Rachel explained to OLARTE that what had been more recently alarming, is that her behaviors had included K.X. banging her head on both concrete and walls, even actually having banged her head on a sheetrock walls so hard to have caused large dimpling and even a hole on one occasion.

52.    Rachel gave her the name of the treating physician under whom she and her husband were using THC to treat her daughter's autism and related behaviors.

13

53.    Rachel explained how she had researched the use of cannabis oils to treat autism, and about a medical organization called "Cannakids" she used as a resource, describing the organization as specifically set up and organized to assist parents treating children for a variety of illnesses using cannabis products and cannabis oil therapies.  Rachel explained how the parents were working with that organization and a dosing specialist in it, and gave OLARTE the specialist's name, Janie Maedler.

54.    Rachel suggested – given OLARTE's claimed ignorance about cannabis oils and the laws governing use of cannabis oils to treat children – OLARTE should in fact call Cannakids and speak with the organization about those topics.

55.    OLARTE never did pursue Rachel's suggestion.

56.    The regular housecleaner used by the parents had been at the house that very morning before OLARTE came, so the house was simply spotless.

57.    OLARTE did not check any cabinets, food storage areas, refrigerator, and only looked in from the doorway into the children's bedroom.  She did not ask to look in any of those places normally reviewed by DFCS social workers when there are allegations of neglect or abuse and social workers are allowed in the home, because it was immediately apparent upon entering the home and speaking even only briefly with Rachel, that these were likely well cared for children in a well cared for home, owned by intelligent and loving parents.

58.    OLARTE did ask to see the medicine bottle with the medicine given to K.X., so Rachel took her in the kitchen, reached up to a high shelf in the kitchen neither child could get to, pulled down the bottle, and handed OLARTE the medicine bottle containing the cannabis derivative THC oil.

59.    OLARTE turned the bottle around in her hands, reading the labeling for what was a minute, not more than two minutes, then handed it back to Rachel, who returned it to the shelf.

60.    OLARTE then commented that Rachel should really keep the medication in a lock box.

61.    Rachel agreed with her, and said that was "fine," and her and her husband would in fact get a lock box.

62.    The parents in fact purchased one the very same weekend, and before the meeting on the 19th of September, 2017 with OLARTE described hereinbelow.

63.    OLARTE would later lie about the event regarding Rachel's willingness to show her the bottle in her Application for a Protective Custody Warrant to take both children, saying Rachel would not show her the bottle and let her look at it, describing Rachel as having "quickly flashed it to [OLARTE] and put it away."

64.    This description was completely false, and of course gave the impression that Rachel was trying to hide something; which was false.

65.    OLARTE then expressed concern about how appropriate the treatment was for K.X., while in nearly the same breath, claiming that she did not know anything about using cannabis oil for treating minors.

66.    However, within minutes thereafter OLARTE contradicted that statement by stating that she would not be so concerned if the parents were treating K.X. with CBD oils as opposed to THC as she knew THC can make children "high."

67.    This statement by OLARTE indicated that she had at least some knowledge of the treatment of minors with cannabis oil as she knew the difference between then main strains of oils that are primarily used for medication, which are in fact CBD oils and THC oils.

68.    OLARTE then asked Rachel about the dosing she was using with the THC on K.X., and Rachel told her she could not provide concrete dosing information for her at that time as they had only just begun treatment with K.X., and she and her husband were still working with the dosing specialist to find the most effective and appropriate dose for K.X.

Complaint
Scanlon, et al., v. County of Los Angeles, et al.
Case No.

69. Rachel did offer to send her the contact number for the company associated with the dosing specialist (Cannakids) along with a copy of the doctor's recommendation that evening.

70. True to her word, at 4:05 p.m. on April 15th, 2017, Rachel e-mailed OLARTE a Physician's Statement which addressed the use of the oil and the consulting role of Dr. Peter Mendelsohn, and a "Primary Caregiver" form, which specifies Rachel as the Primary Caregiver of K.X. in compliance with Health & Safety Code 11362.5.

**OLARTE Goes To G.X.'s School, Interrogates Without Parental Consent**

71. Rachel received a call after OLARTE's visit to the home, but the same day, from her younger daughter's school to state that DFCS had been out to the school and spoken to them (teachers/staff) and to G.X. privately.

72. OLARTE did not seek permission from Rachel or Steven before conducting an interview/interrogation of the minor plaintiff G.X. at her school.

73. OLARTE did not have consent to conduct an interview/interrogation of the minor plaintiff G.X. at her school.

74. There were no allegations of any abuse or neglect of G.X.

75. There being no evidence of any abuse or neglect of G.X., there was no exigency to the circumstances that would excuse the requirement to obtain a warrant or consent.

**Meeting With OLARTE & HARRIS – September 19th, 2017**

76. On September 18th, 2017, OLARTE sent an e-mail asking that Rachel and Steven attend a meeting at the DFCS offices, and the parents agreed to meet the next day, on September 19th, 2017;  OLARTE mistakenly reported this meeting as September 20th, 2017 in her Detention Report but the actual date will be used.

77. When the parents arrived, they were led to a small interview room.

78. Rachel promptly told OLARTE and a social worker HARRIS, that the

family's attorney will be calling into the meeting.

79.   OLARTE and HARRIS both responded that DFCS doesn't allow lawyers to speak directly to social workers during these meetings and said that the family's attorney would only be allowed to speak with their (DFCS's) attorneys and could not be included in the meeting.

80.   Rachel stepped out to call the lawyer, Jennifer Ani, and ask her advice on how to respond to the situation.  Rachel could not get through despite the fact Ani had promised previously to call and be present for the meeting.

81.   Given the tone and demeanor of the social workers, and the perception these social workers were planning to be confrontational – and hoping to avoid that, Rachel and Steven felt they had no other option but to have the meeting without Jennifer Ani.

82.   Once the meeting began, the tone of the meeting was set from the very start as one in which OLARTE and HARRIS felt they were operating with utter omnipotence, and they were there to "tell" the parents how they should be raising their child and handling her autism.

83.   Literally the very first thing OLARTE said when the meeting began was to the effect of, "To make you more aware of our process, when we are called about an instance of abuse or neglect there is a strong possibility that we will remove that child."

84.   This made the meeting immediately confrontational – threatening these two wonderful parents with the removal of their child.

85.   The parents were alarmed and confused about why OLARTE had chosen to begin the meeting with such a clear and a direct threat.

86.   Both parents' response was basically asking why, on what grounds, was OLARTE even talking about the possibility of removal.

87.   Notably, from the beginning and through the entire meeting, there was only

17

any talk about K.X., be it removing her, what medications she was on, whatever the topic was it was all about K.X., with the only exception being the social workers expressed concerns about "access" to the drug on the high shelf in the kitchen.

88.    There was not at any point any concerns or questions raised about G.X. as being the victim of neglect, abuse, or anything else resembling child abuse.

89.    During the meeting, OLARTE asked about whether the parents had in fact purchased a lock box for the medicine bottle, and the parents advised her that they had indeed done so.

90.    Although OLARTE would later put into her Application for the Protective Custody Warrant, "CSW informed mother that [the medicine bottle] should be kept in a locked place[,]" followed by saying that in response, "Mother said neither of her children have access to that area[,]" OLARTE and GONZALEZ left out of the Application that mother and father had in fact already purchased a lock box and advised OLARTE that they had.

91.    At the same time as this portion of their discussion was occurring, about the "dangers" of the medicine bottle, Steven began to explain how the medicine bottle - in addition to having a child proof cap - had a special "stopper" built into it, into which one had to insert the syringe to extract the dose – a very small little hole from which the rather viscous liquid would hardly even drip if upside down.

92.    Rachel responded saying that it was a "non-issue" because they had purchased the lock box OLARTE suggested; to which OLARTE made a concurring response in the nature of, "that's right," or words to that effect.

93.    The parents pointed out they had a recommendation for K.X. to receive the THC therapy and the caregiver card for Rachel, and that they had already been sent that documentation (OLARTE had).

94.    They explained that under California law this was all that was required to

Complaint
Scanlon, et al., v. County of Los Angeles, et al.
Case No.

choose this form of treatment and they were not doing anything illegal.

95.  Rachel at some point in the conversation also explained that she had learned in her research that there is no "lethal" does of cannabis in any form.

96.  OLARTE talked about how K.X. was described by unnamed school staff as appearing to stumble and/or have difficulty walking, and acting in a quiet and disassociated way at school.

97.  OLARTE also claimed that K.X. had to be literally "carried" to her classroom.

98.  Steven told OLARTE bluntly, to the effect of, "What do you think happens when she is on the prescription medications?"  He advised there were not only those same side effects, but many more, including the toxicity of the prescription medications to the child's entire organs and body.

99.   OLARTE and HARRIS ignored that glaringly important fact and Steven's statements on the topic.

100.  Then OLARTE asked about the doctor who gave the recommendation and expressed concern that the parents had not discussed the THC therapy with their child's pediatrician Dr. Gutierrez.

101.  OLARTE also seemed to complain that it wasn't an "FDA Approved" treatment.

102.  Again OLARTE started in about the dosing, and Rachel's claimed reluctance to tell her some specific dosing amount that was being given to K.X.

103.  Rachel, now with the confirmatory comments of Steve along the way, basically told them the same answer she did at the home, she could not specify a specific dose as we were still trying to find the right dosage/strain combination.

104.  Rachel asked if OLARTE had called Cannakids about the dosing as she had asked her to do when OLARTE was at her home?  She indicated she had not.

105.  The parents explained that the use of this medication – a liquid – was not as

19

simple as doing something like "give two pills and then increase or decrease from there based on the patients' response."

106.  The parents also explained that there are different strains of the medication and the concentrations and dosages were being actively adjusted with Cannakids consultation based on the parents' observations of the child.

107.  Rachel also responded to the implicit claim that by not giving OLARTE "the dosage information" immediately when requested four days prior at the family's home, she was somehow being "evasive," telling OLARTE that she was indeed afraid of being misunderstood for one, and at the worst, unintentionally giving OLARTE incorrect information; they were relying on a specialist and that made sense to them.

108.  OLARTE and HARRIS both then expressed that this medical decision that is the parents' right to make – not theirs – caused them concern because it "*might not be*" the right treatment for K.X.

109.  Ironically, this was followed by openly admitting they did not know anything about the treatment and would have to find out more.

110.  Interestingly, right after the social workers said they did not know anything about cannabis oil, OLARTE stated that she would not be so concerned if it were just CBD oil but that giving a child THC oil was like giving her alcohol.

111.  The social workers, when nearing the end of this meeting, presented some documents and asked the parents to sign them.

112.  One of the documents was a medical release that would authorize OLARTE and/or DFCS to obtain all of their child K.X.'s medical records.

113.  The parents are not sure what the other document was at this point.

114.  The parents refused to sign the documents OLARTE and HARRIS wanted them to sign.

115.  As soon as the parents refused to sign the documents the social workers

Complaint
Scanlon, et al., v. County of Los Angeles, et al.
Case No.

wanted them too, HARRIS looked at OLARTE and said words to the effect of, "I think we should just go for a removal order".

116.  OLARTE replied, "Yes. I think so."

117.  OLARTE and HARRIS were thus threatening the parents with removal of their children in order to obtain their "consent" to access the private medical information of the children.

118.  At this point Steve got a little upset and said, "But we're not doing anything illegal. [K.X.] has shown a huge improvement in terms of a huge drop in self-injurious behavior and aggression. Plus, a rise in conversational skills and motivation. She's like a different child. Why are you threatening us with removal?"

119.  After those statements, Steve demanded to see a supervisor of the two social workers.

120.  They left the room and came back in about 10-15 minutes with GONZALEZ. The mood of the social workers – quite suspiciously - took a 180 degree turn, and now all three DFCS social workers present became very positive and supportive, at least in tone and in the way they spoke to the parents.

121.  GONZALES said to the parents that everyone "they" had spoke to said Rachel and Steven were wonderful parents and they had no concerns aside from the use of the cannabis oil.

122.  GONZALEZ indicated they would need to do some research, but that she did not see any reason to seek a removal order, wrapping up the discussion by telling the parents they would get back to them once they had looked a bit more into the topic of cannabis oil as a form of autism therapy.

123.  At no point in the meeting, did OLARTE, HARRIS, or GONAZALEZ, ask the parents to stop using the cannabis oils to treat K.X., or even to pause while they looked into the topic more.

21

124.  As they were leaving, while pondering all that they had just experienced with the social workers, Rachel in fact said to Steven something to the effect of, "they are not done with us yet."

125.  There was no further communication from the social workers (via email or telephone) between the date of the meeting and the removal both children from their respective schools on September 28th, 2017.

**OLARTE & GONZALEZ File Warrant Application**

126.  At some unknown point after the meeting held September 20th, 2017, OLARTE and GONZALEZ discussed the family again, and on or about September 27th, 2017, obtained a warrant from Hon. Rudolph A. Diaz of the County of Los Angeles Superior Court authorizing the removal of not just K.X., but G.X. as well – a child as to whom there was never a single allegation of any abuse or neglect whatsoever.

127.  Though the full participation of HARRIS in the submission of the fraudulent warrant, is unknown, based on the comments of HARRIS at the meeting on September 20th, 2017, wherein HARRIS indicated the desire to move forward with a "removal" of the children, Plaintiffs allege that HARRIS was also a participant in the decision to submit the fraudulent warrant and remove the children.

128.  Plaintiff submits and reiterates that although all of the following fraudulent statements, half-truths, and omissions are cited as coming from OLARTE, GONZALES and HARRIS, actively participated in the decision to seek the warrant, and the preparation of the Application for Protective Custody Warrant, including the Statement of Cause that accompanied the application and was signed by OLARTE.

129.  It should be noted that throughout the Statement of Cause ("SOC"), which is the main declaratory document within the Application for Protective Custody

Warrant submitted to the juvenile court, OLARTE makes references to the wrong dates.  She repeatedly refers to the month of September (09/##/##) as July (07/##/##).  For purpose of this Complaint, the actual month will be used for every reference, even though the original reference is to "July."

130.   OLARTE stated in the SOC in support of her request that the Court issue a warrant to remove the children, all of the following representations and/or assertions of fact that were completely false;

      1 – The parents refused to provide the necessary information to run a criminal [background] check.

      2 - K.X. was arriving at school "unable to stand."

      3 – K.X. was arriving at school "[unable to] respond."

      4 – K.X. was arriving at school "[unable to] write."

      5 – K.X. was arriving at school "[unable to] function."

      6 – K.X. has had to be carried [at school].

      7 – K.X. has had to be picked up from the floor [at school].

      8 – K.X. has had to be "assisted throughout the day [at school] due to the effects of the substance [THC]."

      9 – OLARTE stated, "Both mother and father have not been forthcoming with minor's treatment."

      10 – OLARTE stated Rachel and Steven were treating K.X. with cannabis oil and have not consulted with a medical professional or a professional who deals with autism.

      11 - OLARTE lied about Rachel having "quickly flashed" the bottle of THC concentrate.  OLARTE was literally handed the bottle by Rachel and allowed to hold it, look it over, read the label, etc.

      12 – OLARTE said in the SOC that K.X. was non-verbal and unable to provide a statement.  K.X. is not non-verbal, and Plaintiffs are

Complaint
Scanlon, et al., v. County of Los Angeles, et al.
Case No.

1    informed and believe that OLARTE did not in fact attempt to

2    communicate with K.X. in any way.

3    131.  OLARTE stated all of the following half-truths and/or misrepresentations in

4    the SOC she submitted on or about September 27th, 2017;

5        1 – OLARTE stated that she had asked Rachel for a contact phone

6        number for Ms. Maedler, a woman from Cannakids – where K.X.'s

7        THC was regularly purchased, who was a dosage specialist working

8        with the family in determining an appropriate dosage of THC for K.X.

9        (OLARTE repeatedly in the SOC, incorrectly refers to the medicine

10       given K.X. as "cannabis oil;" it is not)  OLARTE writes in the SOC in

11       a manner calculated to make the Court believe Rachel flippantly

12       refused to provide Ms. Maedler's phone number to OLARTE – which

13       of course was Rachel's right if she chose to exercise it – and that

14       Rachel's response to the inquiry for Dr. Maedler's contact phone

15       number was a flippant comment about OLARTE going ahead and

16       "search it."

17       What OLARTE did not say, but was explained by Rachel, was that

18       when she wanted to reach Ms. Maedler, she herself would go to the

19       Cannakids website and call the number there, and be connected to Ms.

20       Maedler; thus the half-truth reference to "search it."

21       2 – OLARTE states in the SOC that on September 15th, 2017 she went

22       to the home of Rachel, Steven, and the children, and, "explained the

23       allegations."  All that OLARTE said that remotely resembles

24       "explaining the allegations," was that they [DFCS] had received a

25       referral expressing a concern that K.X. had shown up at school

         appearing "intoxicated," then she launched into questions about

         autism and how Rachel treated K.X.'s autism.

24

3 – OLARTE tells the Court in her SOC that she made one attempt to contact Dr. Peter Mendelsohn on September 18th, 2017, but the call rang and there was no answer, therefore she called Rachel and asked to get a better contact number for Dr. Mendelsohn and the Cannakids contact person the very same day. OLARTE tells the Court that although "Mother said she would forward the information via telephone[,] OLARTE claims, "but she did not forward the information as stated."  What OLARTE does not tell the Court in her SOC is that Rachel confirmed the number OLARTE used for Dr. Mendelson was correct in the phone call, and, while Rachel did not, "forward the information via telephone," in less than 24 hours from the time of the phone call Rachel sent OLARTE an e-mail reading as follows;

"Hi Lourdes,
I reached out to the CEO of Cannakids. Her name is Tracy Ryan. If you reach out to her, she will schedule a call with you.
tracy@cannakids.org

After making an issue - in the SOC submitted in support of the Warrant Application - out of the alleged reluctance of Rachel to provide the Cannakids phone number, OLARTE did not tell the Court she was not "willing" to speak to Cannakids.  However, that was exactly what she told Rachel and Steven during the meeting on September 20th, 2017, saying she was not willing to talk to Cannakids because [in OLARTE's opinion], "they [are] just a business trying to sell a product and ha[ve] no credibility."

4 - OLARTE tells the Court in the SOC that she spoke with Dr. Gutierrez, the children's pediatrician, about K.X., and that Dr. Gutierrez told her, "[S]he has no concerns regarding [K.X.]"

Complaint
Scanlon, et al., v. County of Los Angeles, et al.
Case No.

OLARTE also stated that she asked Dr. Gutierrez if Rachel had discussed treating K.X. with cannabis oil and the doctor indicated it had not been discussed with her. What OLARTE left out of the SOC regarding the discussion with Dr. Gutierrez, as Dr. Gutierrez later reported to a subsequent physician treating K.X., was that Dr. Gutierrez told OLARTE that she had "no objections" to the parents treating K.X. with cannabis oil and she would, "need to do some research."

5 – OLARTE wrote in her Application that, "CSW informed mother that [the medicine bottle] should be kept in a locked place[,]" followed by saying that in response, "Mother said neither of her children have access to that area."  However, OLARTE and GONZALEZ left out of the Application that mother and father had in fact already purchased a lock box.

6 – OLARTE wrote in her SOC, "In addition, parents say they are 'experimenting' with the dosage given."  The quotations marks around the word "experimenting" are in the original SOC.  Further to this "half-truth" presentation, OLARTE had said earlier in the SOC that she asked mother how mother was determining the correct dosage (when at the home), and that mother had replied saying she was, "not comfortable discussing the dosage any further."  What OLARTE did not say, although saying, "Mother said CSW could talk to CannaKids dosage specialist, Janie Madler," was that OLARTE was told that Janie Madler was in fact the dosage specialist mother and father were working with to assess the proper dosage for K.X.  The claimed, and emphasized "experimenting" was no different than the application of any medication to the treatment of an affliction.  Dosages are

26

monitored, effects watched for and observed, and dosages modified if necessary, drugs changed if necessary, drugs discontinued if prudent. OLARTE specifically left out that Janie Maedler was the family's dosing specialist – and as noted previously OLARTE never called and spoke with Ms. Maedler.

132. OLARTE made the following omissions in the SOC she submitted on or about September 27th, 2017;

1 – The fact, as noted by GONZALEZ at the meeting on September 20th after discussing the matter with OLARTE, that everyone "they" had spoken to, which included school teachers and staff of the children, said Rachel and Steven were wonderful parents and they had no concerns aside from the use of the cannabis oil. These representations, in more detailed form, came from at least the following persons; Ms. Paula Terzoli, the principal at Brighter Days Montessori where G.X. attended at the time of OLARTE's unlawful interrogation of the child, who told OLARTE on September 15th, 2017, that G.X. was a "great kid" and they [the school] have no concerns regarding G.X., and further that K.X. had previously attended the school, and the parents were "great with [K.X.]," and she described Rachel as "very involved and always attending to any issues and/or concerns." Finally, Ms. Trezoli also noted that G.X. was always clean and well cared for and described K.X. the same way when she attended the school previously. All of these words of praise were also agreed to by two of G.X.'s teachers (past and current), Nicole Lundquist and Karen Winston.

2 – The fact that Dr. Gutierrez had said she had "no objection" to the use of cannabis oils to treat K.X.'s autism.

27

3 – The SOC included the statement that Dr. Gutierrez had prescribed a drug called Vayarin that could possibly address the balance symptoms K.X. was having, and followed that with the statement, "[Dr. Gutierrez] was not sure of mother's follow up with both the Vayarin and the psychologist referrals but [K.X.] ha a follow up appointment for 09/22/17." What OLARTE left out, was that Rachel had told her in the meeting of September 20th, 2017, that she was indeed giving K.X. the Vayarin that Dr. Gutierrez had prescribed.

4 - OLARTE never spoke to a person during her investigation that had actually seen the alleged behaviors and circumstances with regard to K.X. having balance or malaise issues at school.

**Aftermath – Children Separated - Returned At First Court Appearance**

133. The children were removed from their schools on September 28th, 2017.

134. OLARTE picked up G.X. from her school.

135. HARRIS picked up K.X. from her school.

136. Rachel was at the school waiting to pick up K.X. in her car, when she received a call from G.X.'s school telling her that a social worker had just taken G.X. She left her car and went into the school.

137. In the school she found HARRIS, and understandably expressed shock and confusion as to why her child was being taken.

138. HARRIS's response was to tell her that she could either cooperate and let K.X. go with HARRIS right then, or, HARRIS would call the police and get them involved.

139. Fighting back tears because Rachel knew that if she showed any signs of distress her young autistic daughter would immediately pick up on that and become anxious and agitated herself, Rachel assisted in getting K.X. out of the school and safely into HARRIS's vehicle, doing her best to keep K.X. calm.

28

140.  K.X. did remain calm at least through the time of putting her in the car.

141.  The foster care mother told Rachel in a phone call a day later or so, that although Rachel mentioned in the call that K.X. had been calm when put in the car, the foster mother said that K.X. came out of the car at the foster mother's home and was severely anxious and agitated and was literally clinging and hanging, and being very physically aggressive to the social worker.

142.  The foster mother went so far as to describe K.X. as, "climbing the social worker like a tree."

143.  The children were immediately separated into two different foster homes.

144.  This was particularly traumatic to K.X., whose entire well-being as an autistic child was tied to the consistency and routine of her daily affairs.

145.  K.X. continued to attend her school, however, the teachers and school staff reported to Rachel that K.X. was basically a mess emotionally, advising Rachel that K.X. had been hiding under tables, asking repeatedly for her parents, and in the principals words, "we can't get anything out of her."

146.  The parents did not have any physical contact with their children until they were returned by the Court on October 2nd, 2017.

147.  At no time did anyone from DFCS contact the parents to arrange visitation with either child.

148.  Prior to the removal of these children from their parents, neither one had ever stayed even one single night out of the parents' care.

149.  As to G.X., one particularly poignant comment came when the parents were allowed to speak to her on the phone on the second or third day, and G.X. asked her parents on the phone, "What am I doing here? And she followed that up with the comment, "I still have a home, right?"  The parents immediately started crying, but of course made every attempt to not let G.X. pick up on the fact that they were crying, and shortly thereafter ended the call.

150.  In a call from OLARTE the evening the children were taken, Rachel was asked if they had any family in the area who could take care of the kids.

151.  Rachel asked OLARTE if the children could please be placed together, because G.X. would provide great comfort to K.X. by her mere presence.

152.  OLARTE responded by saying that was not possible because their "needs" were so different.

153.  Rachel then said that she really could not suggest any friend or family to take on the placement/care of K.X. – given her special needs and pointing out the violent behaviors would shortly return since now K.X. would not be receiving her THC oils which had almost entirely ameliorated the behaviors.

154.  Rachel reluctantly had to tell OLARTE that they simply had no family or close friends she was aware of that could just suddenly have her autistic daughter, with her host of issues, placed in their home.

155.  Rachel later learned, that despite OLARTE's claims the children's "needs" were so different, K.X. was placed in a home where the care providers had zero experience with autism.

156.  Rachel also learned that the foster mother was seven (7) months pregnant at the time.

157.  Rachel did respond that there was a family that could take G.X., and she gave the social workers the name and contact information for that family.  N

158.  No one from DFCS ever even reached out to that family to inquire about their willingness to take placement of G.X. at any time.

159.  Rachel learned that G.X. was placed an hour away from the parents, with a Spanish speaking family.

160.   At the very first court appearance on October 2nd, 2017, the children were returned to their parents.

161.  Almost immediately after the children were removed, Rachel learned that

OLARTE, GONZALEZ, and HARRIS were for some reason taken off the case involving the children.

162.  Rachel also learned from the foster mother, that the foster family had received no paperwork / documentation regarding the children and their medical or mental health needs, until October 1st, 2017, the day before the children were returned.

163.  After the children were returned, Rachel also spoke with the foster mother for K.X.

164.  K.X. was placed with an African-American couple, and the foster mother told Rachel that she too did not receive any paperwork indicating they were authorized to have possession of the white child with white/blond hair and blue eyes, and she was concerned if anyone were to have questioned how the family came to be in possession of this starkly different-appearing child, K.X., she would have nothing to show lawful possession of the child.  The foster mother indicated she had been on the phone constantly trying to obtain the appropriate paperwork during the time K.X. was with her, to no avail.

**Case Dismissed – With Prejudice – Interests of Justice**

165.  On December 7th, 2017, a Jurisdictional hearing – a hearing where the sole question is whether a child falls within the definition of one of the W&IC Sections "a" through "j" was held.

166.  At the hearing, the Judge said over and over that there was no evidence of any abuse or neglect of either child, and in fact stated the parenting of the children was quite the opposite in fact.

167.  The COUNTY's lawyer pushed to keep DCFS in the family's life, saying they wanted to "monitor" the administration of the THC cannabis oil, but the Judge both pointed out that the parents were not administering it at the time, and, even if the parents chose to do so under the direction of the doctor the family had

Complaint
Scanlon, et al., v. County of Los Angeles, et al.
Case No.

retained, it was legal in the state of California and that was their right.

168.  The Judge dismissed the case, with prejudice, in the "interests of justice."

## IV.   DAMAGES

169.  As a result of the conduct of Defendants, Plaintiffs suffered severe emotional distress, anxiety and damage to their psyche, to such an extent as to cause physical manifestations of pain and symptoms of nausea and severe depression, including but not limited to sleeplessness, headaches, fatigue, malaise, irritability, inability to focus, loss of appetite, and loss of weight. Plaintiffs developed an abiding fear and distrust of authority figures and particularly social workers.  The minor children manifested the symptoms of their severe emotional distress with – in addition to the symptoms aforesaid – an enduring behavior pattern of hypervigilance, where both, but particularly G.X. would become anxious and at times distraught when separated thereafter from her parents for routine events like a parent running to the store, or going to work, or even being outside G.X.'s field of vision.  Additionally, G.X., who had been doing fine and on-track academically before her removal, lost all interest in education and now must repeat kindergarten.

170.  The incident of the removal also caused humiliation and embarrassment and loss of reputation in the community to Rachel and Steven, caused the incursion of attorney fees, medical fees, therapy fees, and expenses related thereto, and is likely to cause the incursion of further medical, therapy, and/or counseling fees in the future as well as expenses related thereto.

171.  Plaintiffs seek an award of exemplary (punitive) damages pursuant to California Civil Code §3294, and any state or federal laws authorizing the award of punitive damages, to make an example of and punish the individual Defendants, and in the hope of deterring future conduct of a similar nature.

## V.   CLAIMS FOR RELIEF

Complaint
Scanlon, et al., v. County of Los Angeles, et al.
Case No.

# FIRST CLAIM FOR RELIEF

## 4TH / 14TH AMENDMENT VIOLATION – INTERVIEW OF MINOR WITHOUT PARENTAL NOTICE/CONSENT

[Rachel, Steven, G.X. vs. Olarte & Gonzalez and Does 1-10]

172.  Plaintiffs Rachel, Steven, and G.X. incorporate paragraphs 1 through 168 as though fully set forth herein, and allege as to OLARTE and GONZALEZ, a violation of Rachel, Steven, and G.X.'s 14th Amendment rights of familial association, and G.X.'s 4th Amendment rights prohibiting unreasonable search and seizure, based on the conduct by OLARTE and GONZALEZ, which Plaintiffs are informed and believe and thereon allege was encouraged, directed, and/or ratified by GONZALEZ, to wit, the act of OLARTE going to G.X.'s school and pulling her out of class to conduct an investigative interview without the advance notice and/or consent of either parent; in engaging in this action, OLARTE was motivated by, and following, a policy and/or practice of the COUNTY.

173.  This action/conduct of interviewing G.X. without notice or consent of either parent was in fact done with malice and/or reckless disregard for the rights of each of the identified Plaintiffs, because OLARTE, with consultation and encouragement of GONZALEZ, engaged in this act specifically in retaliation and for the reason that she did not feel she received the cooperation and respect from Rachel that she so mistakenly believes she deserved on September 15th, 2017 when she came to the family's home.

174.  Plaintiffs further allege that the aforementioned conduct, additionally constituted a violation of the Plaintiffs 1st Amendment rights to be free from unjustified, unreasonable, and unlawful interference in their relationship.

175. Plaintiffs incorporate herein the damage allegations of paragraphs 169 through 170, as they relate to this Claim for Relief.

176. Plaintiffs incorporate herein the punitive damage allegations of paragraph 171, as punitive damages relate to the malicious and/or reckless conduct alleged in this Claim for Relief.

### SECOND CLAIM FOR RELIEF

### 4TH / 14TH AMENDMENT VIOLATION – REMOVAL BY FRAUDULENT WARRANT

[Plaintiffs v. Olarte, Gonzalez, Harris, Hashizume, and Does 1-10]

177. Plaintiffs incorporate paragraphs 1 through 168 as though fully set forth herein, and allege as against OLARTE, GONZALEZ, and HARRIS, that the conduct of participating in the filing of an Application for Protective Custody Warrant which contained the numerous false and misrepresented statements of fact and omitted exculpatory information described hereinabove, led to the violation of the 14th Amendment rights of familial association of all Plaintiffs, and the violation of the 4th Amendment rights of the minor plaintiffs K.X. and G.X., in that the children were removed from the care, custody and control of their parents.

178. Additionally, HARRIS and OLARTE were the physical "removers" of the children, thus personally involved in the 4th Amendment violations alleged by K.X. and G.X. by those removals.

179. Plaintiffs further allege that the W&IC 300 Petition, if submitted with the Application for Protective Custody Warrant, which fact is unknown to Plaintiffs but a known practice of DFCS social workers, was in furtherance of the fraud on the Court as it alleged that the parents had placed K.X. in a detrimental and endangering situation(s), and, that the      cannabis oil was located within "access

34

of the children in the children's home[,]" and therefore HASHIZUME is also liable for the 4th and 14th Amendment violations complained of in this Claim for Relief.

180.  The Petition further falsely alleged that the parents conduct aforesaid, put both children's physical health and safety at risk of serious physical harm, damage, and danger, all of which was entirely false.

181.  Plaintiffs incorporate herein the damage allegations of paragraphs 169 through 170, as they relate to this Claim for Relief.

182.  Plaintiffs incorporate herein the punitive damage allegations of paragraph 171, as punitive damages relate to the malicious and/or reckless  conduct alleged in this Claim for Relief.

### THIRD CLAIM FOR RELIEF

### VIOLATION DUE PROCESS RIGHT TO BE FREE FROM DECEPTION IN PRESENTATION OF EVIDENCE TO COURT

[All Plaintiffs vs. All Defendants, Does 1-10]

183.  Plaintiffs incorporate paragraphs 1 through 168 as though fully set forth herein, and allege as to OLARTE, GONZALEZ, HARRIS, and HASHIZUME, a violation of all Plaintiffs clearly established due process right of individuals not to be subjected to the deliberate presentation of false or perjured evidence, and/or by the suppression of exculpatory information in court proceedings or in documents submitted with recommendations or requests made to the court. Any reasonable social services agent and/or government actor would know that it is a due process violation to lie, exaggerate, fabricate evidence, and/or suppress material exculpatory evidence in court Warrant applications, Petitions, Detention and Jurisdiction Reports and other documents filed with the juvenile court, and/or known to be likely relied upon by subsequent social workers.

184.  Defendants OLARTE, GONZALEZ, HARRIS, and HASHIZUME had the affirmative and self-evident duty to be truthful, accurate, and complete in all documents submitted to the juvenile dependency court – a court with power to adjudicate substantial rights, including legal rights including medical decision-making authority, custodial rights, and placement of children. Similarly, defendants had an equal duty to refrain from using improper and deceptive means to obtain judicial orders sustaining recommendations, disparaging, and/or otherwise impairing or impinging upon Plaintiffs' due process rights.

185.  Defendants and DOES 1-10 and each of them, either singularly or jointly acted to deliberately or recklessly avoid all the duties and obligations aforesaid, and proceeded to present false statements and half-truths, and/or omit known exculpatory omissions material in the Warrant Application (as to OLARTE, GONZALEZ and HARRIS only), likewise in the Juvenile Dependency Petition (HASHIZUME), and likewise in any and all reports filed in the Juvenile Court (OLARTE & GONZALEZ).

186.  The fraudulent and deceptive conduct of these individuals alleged hereinabove, caused K.X.'s and G.X.'s original removal and separation from their parents, and the caused or contributed to the continued and prolonged detention and separation of the family members.

187.  Plaintiffs incorporate herein the damage allegations of paragraphs 169 through 170, as they relate to this Claim for Relief.

188.  Plaintiffs incorporate herein the punitive damage allegations of paragraph 171, as punitive damages relate to the malicious and/or reckless conduct alleged in this Claim for Relief.

## FOURTH CLAIM FOR RELIEF

### 4TH / 14TH AMENDMENT                      VIOLATION –

Complaint
Scanlon, et al., v. County of Los Angeles, et al.
Case No.

## MEDICAL EXAMS WITHOUT PARENTAL NOTICE/CONSENT

[Plaintiffs vs. Olarte, Gonzalez, Does 1-10]

189.  Plaintiffs incorporate paragraphs 1 through 168 as though fully set forth herein, and allege as to OLARTE and GONZALEZ a violation of all Plaintiffs 14th Amendment rights of familial association, and the violation of the 4th Amendment rights of the minor plaintiffs K.X. and G.X. to be free from unreasonable search and seizure and/or the privacy of their bodies, in that the children were subjected to medical and/or mental health examinations/ assessments without prior notice to either adult Plaintiff while in the care of COUNTY, without either adult Plaintiff being given the opportunity to attend such medical and/or mental health examinations of the children, and without the consent of either adult Plaintiff as to holding such medical and/or mental health examinations, or the examinations, assessments, or treatments prescribed or conducted during such medical and/or mental health examinations.

190.  Plaintiffs are ignorant of persons other than OLARTE and GONZALEZ who may have participated in some active and meaningful way in the scheduling or delivery of the minor plaintiffs K.X. and G.X. to the un-noticed and un-consented to medical and/or mental health examinations complained of, but Plaintiffs are informed and believe that there is or would have been other individuals involved, and therefore sues these unknown individuals as Defendant Does 1-10 at this time.

191.  Plaintiffs incorporate herein the damage allegations of paragraphs 169 through 170, as they relate to this Claim for Relief.

192.  Plaintiffs incorporate herein the punitive damage allegations of paragraph 171, as punitive damages relate to the malicious and/or reckless  conduct alleged in this Claim for Relief.

Complaint
Scanlon, et al., v. County of Los Angeles, et al.
Case No.

## FIFTH CLAIM FOR RELIEF

## MONELL LIABILITY

[Plaintiffs vs. County of Los Angeles]

193.   Plaintiffs incorporate paragraphs 1 through 168 as though fully set forth herein, and allege that the policies, customs, and practices, and/or non-existent or inadequate training described herein above in paragraphs 19 through 34 generally and as having occurred in the juvenile dependency cases cited in said paragraphs, which same policies, customs, and practices, and/or non-existent or inadequate training were a moving force in the violations complained of herein above with regard to these Plaintiffs' constitutional rights.

194.  Plaintiffs allege these policies, practices, customs and training related issues make the COUNTY itself liable for the actions of the individually named social worker Defendants, and Plaintiffs seek to hold COUNTY liable thereon by this Complaint under the theory of law set forth in *Monell v. Dept of Social Services*, 436 U.S. 658 (1978) and its progeny.

195.  The polices, practices, customs, and/or the non-existent or inadequate training of COUNTY social workers such as the individually named defendants, were the moving force behind the unlawful interrogation of G.X. at the school, the submitting of the children to medical examinations, treatments, and assessments without parental notice, opportunity to attend, or consent, the cessation of the effective, non-habit forming, non-pharmaceutical THC treatments received by L.X., and the repeated making of false representations, submission of misrepresentations, and omissions of exculpatory information to the juvenile court during the juvenile dependency proceedings involving the minors.

196.  Plaintiffs incorporate herein the damage allegations of paragraphs 169

38

through 170, as they relate to this Claim for Relief.

## SIXTH CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

[K.X., G.X. vs. Olarte, Gonzalez, Harris, Hashizume, Does 1-10]

197.   Plaintiffs K.X. and G.X. incorporate paragraphs 1 through 168 as though fully set forth herein, as Plaintiffs K.X. and G.X. allege the facts and circumstances set forth hereinabove as related to the interview of G.X. at the school on Septemeber 15th, 2017, a claim sole to G.X. and against OLARTE and GONZALEZ, and as to all individually named Defendants with regard to the wrongful removal and continued detention of both minor Plaintiffs by way of the fraudulently obtained Warrant for their removal, and the Defendants' false statements and misrepresentations to the juvenile court and failures to disclose and/or intentional withholding of exculpatory evidence used to obtain their removal and continued detention – inclusive of the actions of IDC worker HASHIZUME as to her contributions / omissions to the W&IC 300 Petition, as well as the unlawful medical and/or mental health examinations and treatment to which they were subjected without notification, presence, or consent of their parents, and Plaintiffs contend these actions aforesaid set forth all necessary elements for a claim for relief against Defendants OLARTE, GONZALEZ, HARRIS, and HASHIZUME, and Does 1-10, for intentional infliction of emotional distress, in that the actions of these individual and Doe Defendants set forth hereinabove were intended to cause, or were engaged in with reckless disregard of causing – and did cause, the minor Plaintiffs severe emotional distress, which manifested in the emotions and physical symptoms caused by such severe distress, as further described in paragraphs 169 through 170.

198.  Plaintiffs K.X. and G.X. incorporate herein the damage allegations of paragraphs 169 through 170, as they relate to this Claim for Relief.

199.  Plaintiffs K.X. and G.X. incorporate herein the punitive damage allegations of paragraph 171, as punitive damages relate to the malicious and/or reckless conduct alleged in this Claim for Relief.

**PRAYER FOR RELIEF,**

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1.) Award Plaintiffs special and compensatory damages in an amount to be proven at trial.

2.) Award Plaintiffs punitive damages against individual Defendants, and each of them, for their extreme and outrageous conduct in complete disregard for the rights of the Plaintiffs, which punitive damages are not sought by law as against the County of Los Angeles;

3.) Award Plaintiffs statutory damages and/or attorney's fees against all Defendants as allowed by 42 U.S.C. §1983 and any provision of state or federal law allowing for awards of damages and/or attorney fees.

4.) Grant Plaintiffs such other and further relief as the Court may deem just and proper.

POWELL & ASSOCIATES

Dated: September 6, 2018            _____/S/ Robert R. Powell_____
ROBERT R. POWELL, ESQ.
Attorney for Plaintiffs

**Jury Trial Demanded**

POWELL & ASSOCIATES

Dated: September 6, 2018            _____/S/ Robert R. Powell_____
ROBERT R. POWELL, ESQ.
Attorney for Plaintiffs

Complaint
Scanlon, et al., v. County of Los Angeles, et al.
Case No.