1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**
9              **CENTRAL DISTRICT OF CALIFORNIA**
10

11   RACHEL SCANLON, *et al*,          Case No.: CV 18-07759 CBM
                                        (ASx)
12          Plaintiffs,

13   vs.
                                        **ORDER RE: DEFENDANTS'**
14   COUNTY OF LOS ANGELES, *et al*,    **MOTION FOR SUMMARY**
                                        **JUDGMENT (DKT. 135, 137.)**
15          Defendants.

16

17        The matter before the Court is Defendants' County of Los Angeles, Lourdes

18   Olarte, Marisol Gonzalez, Marisha Harris and Angela Hashizume's Motion for

19   Summary Judgment (the "Motion").[1]  (Dkt. 135, 137.)  Plaintiffs Rachel Scanlon,

20   Steven Sawyer, K.X. and G.X. filed an Opposition and Defendants filed a Reply.

21   (Dkt. 150, 155.)

22                              **I. BACKGROUND**

23        In August 2017, Plaintiffs Rachel Scanlon and Steven Sawyer ("Parents")

24   obtained Tetrahydrocannabinol ("THC," also referred to herein as "cannabis oil")

25   from CannaKids for the purpose of treating their daughter, Plaintiff K.X.'s

26   aggression and headbanging.  (SUF ¶ 4.)  Plaintiffs have another child, Plaintiff

27   _____

28   [1]  The Court dismissed Defendants Harris and Hashizume during the hearing on February 23,
     2021.

G.X., but G.X. was not receiving THC for treatment.  THC is a derivative compound found in marijuana.  (SUF ¶ 2.)  Side effects of THC can include impairment.  (SUF ¶ 3.)  No pediatrician was overseeing the administration of the THC to K.X. until October 2017.  (SUF ¶ 5.)  K.X.'s regular treating pediatrician, Dr. Elaine Gutierrez, was never consulted and had no idea about marijuana treatment prior to October 2017.  (SUF ¶ 6.)

In September 2017, there were two or three separate referrals to the DCFS child welfare hotline reporting concern that K.X. was under the influence of marijuana at school, appeared to be lethargic, with her balance being off.  (SUF ¶ 9.)  On September 15, 2017, Defendant Lourdes Olarte, an Emergency Response Children's Social Worker ("CSW") with over 12 years of experience, responded to the Plaintiffs' home and met with Plaintiff Scanlon.  (SUF ¶ 11.)  Plaintiffs were "experimenting" with the dosages of the marijuana treatment given to K.X.  (SUF ¶ 7.)[2]  Defendant Olarte also asked about the younger sister, G.X.  (SUF ¶ 15.)  Plaintiff Scanlon initially did not want to discuss G.X.  (SUF ¶ 15.)  Plaintiff Scanlon told Defendant Olarte to "google" and to look up information regarding marijuana treatment.  (SUF ¶ 16.)  Plaintiff Scanlon admitted that the medication was on a high shelf but was not secured in a lockbox to be protected from G.X.'s reach.  (SUF ¶ 17.)  Defendant Olarte told Plaintiff Scanlon that the cannabis oil should be placed in a lockbox.  (Plaintiff's Additional Facts ¶ 218.)

After leaving Plaintiffs' house, Defendant Olarte went to G.X.'s school and met with G.X. privately.  (SUF ¶ 18.)  Defendant Olarte asked G.X. if she had ever "touched the [THC] bottle," and G.X. told her that she touched the bottle when she climbed on the counter to get snacks from the shelf.  (Depo. Olarte 134:23-

---

[2]  Plaintiffs argue that this fact is in dispute and cites to Defendant Olarte's deposition where she answers "No" to whether Plaintiffs represented that she was determining the dosage of cannabis without the consultation from *any source or person or entity*.  (Depo. Olarte 188:9-13, Dkt. 134-12.)  However, the issue in this motion is whether Plaintiffs received consultation of dosage amounts from a doctor or pediatrician, not just any person or entity (i.e. CannaKids).  Plaintiffs provide no evidence to the contrary.

135:3, Dkt. 150-8.)  During her investigation, Defendant Olarte spoke with pediatrician Dr. Gutierrez, who confirmed she knew nothing about K.X.'s marijuana treatment and was never consulted.  (SUF ¶ 21.)  Defendant Olarte also spoke with K.X.'s teacher and attempted to make calls to Cannakids but was unable to reach anyone there.  (SUF ¶ 22.)  She also made attempts to reach the doctor who provided K.X. with the recommendation for marijuana, Dr. Peter Mendelsohn, but was unable to reach him.  (SUF ¶ 23.)

A meeting was held with the parents at the Social Worker's office on or about September 19, 2017.  (SUF ¶ 26.)  There were no lawyers present in the meeting, per DCFS policy.  (SUF ¶ 27.)  Defendant Marisha Harris, a social worker, also attended the meeting, and was later joined by Defendant ("Supervisor") Marisol Gonzalez upon the request of Plaintiff Sawyer.  (SUF ¶ 28.)  The social workers explained they wanted information about the marijuana treatment because they were concerned about the initial reports and they wanted assurances that a pediatrician would be overseeing the treatment.  (SUF ¶ 29.)  Plaintiff Scanlon testified in her deposition that at the meeting, she told the social workers that she had purchased the lockbox Defendant Olarte had suggested when she visited to the home.  Defendant Olarte testified that Plaintiff Scanlon did not mention having purchased the lockbox at the meeting with the social workers on September 19, 2017.  Plaintiff Sawyer became upset at the social workers and the meeting ended.  (SUF ¶ 30.)

Subsequent to the meeting, Defendant Olarte prepared the "warrant package" to be submitted to the dependency court seeking a request for authorization of removal for both children on September 26, 2017.  (SUF ¶ 31.)  The warrant package included a statement of cause ("SOC") and a declaration from Defendant Olarte that contained the reasons why DCFS was seeking removal of the two children.  (SUF ¶ 33.)  The warrant package also included statements from the parents that the marijuana was helping K.X. and statements from

educators that Plaintiff Scanlon and Plaintiff Sawyer were good parents.  (SUF ¶ 34.)  In the SOC, Defendant Olarte noted that G.X.'s teacher confirmed that G.X. was a "great kid" and there were no concerns about her.  (SUF ¶ 20.)  The teacher also stated that K.X. had previously attended the school and the parents "were great with [K.X.]."  (SUF ¶ 20.)  She further "described mother as very involved and always attending to any issues and/or concerns.  (Id.)  She added that G.X. and K.X. (when she previously attended) were always clean and well cared for.  (Id.)  Defendant Olarte also spoke with [G.X.]'s current and prior teachers, who both had "no concerns regarding the minor and her care."  (Id.)

Defendant Olarte also prepared a detention report based not only on the lack of supervision by a medical professional, but also based on what she described as lack of cooperation by the parents.  (SUF ¶ 36.)  Her report also set forth a request to detain G.X., the five-year old sibling, based on the risk stemming from the administration of marijuana-derived oil to her nine-year old sister without any kind of medical supervision and her ability to access the oil.  (SUF ¶ 37.)  Defendant Olarte concluded that the  Plaintiffs' "physical environment" posed a threat to the children's health or safety.  (Dkt. 134-3).

Supervisor Gonzalez reviewed paperwork that had been prepared by the social worker and signed the detention report.  (SUF ¶ 38.)  Supervisor Gonzalez relied on the information that Defendant Olarte provided from her investigation.  (SUF ¶ 39.)  She supervised Emergency Response workers, including Defendant Olarte, who sought the warrants to remove children.  (SUF ¶ 40.)  The warrant package was filed on September 27, 2020 and the court reviewed and executed a warrant to detain both children.  (SUF ¶ 43.)

K.X. and G.X. were removed from their parents' custody on September 28, 2017, and placed in foster care.  (SUF ¶ 50.)  The parents were notified that a hearing would take place on October 3, 2017, with the dependency court.  (SUF ¶ 53.)  After the hearing, the court released both minors back to the custody of their

parents.  (SUF ¶ 55.)  Only after the children were removed was Defendant Olarte provided with the contact information for Dr. Bonnie Goldstein, a pediatrician who specializes in cannabis treatment.  (SUF ¶ 51.)  Defendant Olarte attempted to reach Dr. Goldstein but was unsuccessful.  (SUF ¶ 52.)   The two minors were never removed from their parents again and continued to live in their parents' home.  (SUF ¶ 56.)  The petition for removal was dismissed with prejudice on December 7, 2017.  (SUF ¶ 57.)

Plaintiffs filed a First Amended Complaint ("FAC") on March 5, 2019.  The Court granted Defendants' Motion for judgment on the pleading on Plaintiffs' First (violation of the First, Fourth and Fourteenth Amendment) and Fourth (violation of Fourth and Fourteenth Amendment) causes of action.  (Dkt. 83.)  The remaining causes of action are: Second Claim (removal by fraudulent warrant); Third Claim (right to be free from deception); portions of the Fifth Claim (*Monell*) that survived the Order re Judgment on the pleading (Dkt. 114.); and the Sixth Claim (intentional infliction of emotional distress).  Defendants' Motion for Summary Judgment follows.

## II. JURISDICTION

The Court has jurisdiction over this action under 42 U.S.C. § 1983.

## III. LEGAL STANDARD

When considering a motion for summary judgment, the court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence."  *Egberto v. Nev. Dep't of Corr.*, 678 Fed. Appx. 500, 503 (9th Cir. 2017); Fed. R. Civ. P. 56.  Summary judgment is appropriate where, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Scafidi v. Las Vegas Metro. Police Dep't*, 966 F.3d 960, 962 (9th Cir. 2020).   A factual dispute is "material" only if it might affect the outcome of the suit under governing law.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  *Id*. at 249.

## IV. DISCUSSION

### A.    K.X., Plaintiff Scanlon and Plaintiff Sawyer

**1.    Second Cause of Action: Removal by Fraudulent Warrant in violation of the Fourth and Fourteenth Amendment**

Defendants move for summary judgment on the grounds that the alleged misrepresentations were not material to the finding of probable case.  Plaintiffs contend that Defendants Gonzales and Olarte engaged in judicial deception by "lying" and "omitting" material facts to procure a warrant to detain the minors.

In order to survive summary judgment on a § 1983 claim of judicial deception, Plaintiffs need not establish specific intent to deceive the issuing court. *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011).  "Rather, the plaintiff must (1) establish that the warrant affidavit contained misrepresentations or omissions material to the finding of probable cause, and (2) make a substantial showing that the misrepresentations or omissions were made intentionally or with reckless disregard for the truth."  *Id.* (internal quotation marks omitted).

#### a. Defendant Olarte

In cases involving allegations of omission by government employees, the Ninth Circuit held, "the government need not include all of the information in its possession to obtain a search warrant. . . . The omission of facts rises to the level of misrepresentation only if the omitted facts cast doubt on the existence of probable cause."  *Ewing v. City of Stockton*, 588 F.3d 1218, 1226 (9th Cir. 2009) (internal citation marks and brackets omitted).  Plaintiffs' counsel provides a list of statements in its Opposition to Defendants' Motion to show Defendant Olarte "lied about, misrepresented, or omitted exculpatory and explanatory information" in the SOC by stating:

1
2        1) K.X. is unable to communicate or articulate,
3        2) Ms. [Alida] Turner [(K.X.'s teacher)] noticed K.X.
         "appeared to be under the influence,"
4        3) Ms. Turner said K.X. was "giggly one moment, and
         overly calm the next,"
5        4) Ms. Turner said K.X. stumbled around,
6        5). Ms. Turner said K.X. was close to falling over,
         6) Ms. Turner said K.X. "had to be assisted, almost
7        carried, due to her state,"
8        7) Ms. Turner said K.X.'s eyes were "droopy,"
         8) Ms. Turner said K.X. "displayed a delayed response,"
9        9) Ms. Turner "denied having any concerns the previous
10       year,"
         10) Ms. Turner said K.X. is "unable to write her name or
11       keep her pencil straight" . . .,
12       11) [Plaintiff Scanlon] said she would send the dosing
         chart / . . . [but] did not,
13       12) "The parents refused to provide the necessary
14       information to run a criminal check," omitting the fact
         [that the social worker] never asked for "the necessary
15       information" before removal,
16       13) (during visit 9/15/17 to [the] home) Rachel "quickly
         flashed [the medicine bottle] to [Olarte] and put it away,"
17       14) the parents said (at the 9/19/17 meeting) they were
18       "experimenting" with the medicine dosage.

19
20   (Opp. at p. 11.)[3]
21          During her deposition, Defendant Olarte was asked whether she believed
22   Plaintiffs had "withheld something significant in [her] effort to assure KX's
23   safety," and she responded, "Yes. . . . the dosage chart."  (Olarte Depo p. 128:25-
24   _____
25   3   In various places in the Opposition, Plaintiffs include other misrepresented or omitted facts
     about K.X. riding a tricycle while being observed, that Defendant Olarte failed to ask K.X.'s
26   teachers about whether the "new medicine" was helping, that Defendant Olarte "lie[d]" about
     not receiving the Cannakids contact information, and that Defendant Olarte omitted the fact that
27   parents told the social workers that they purchased a lockbox to keep the THC medicine in at the
     September 19, 2017, meeting, prior to the warrant package being filed in court.  (Opp. at p. 12.)
28

129:6.)  In the SOC, Defendant Olarte noted that Plaintiff Scanlon was "still trying to figure out correct dosage" and did not feel comfortable sharing the information with Defendant.  Defendant Olarte's deposition and SOC show DCFS was concerned that parents "ha[d] not consulted with a medical professional or a professional who deals with [treating] autism [with cannabis oil]."  (SOC Dkt. 134-5 p. 8.)  Defendant Olarte's SOC found that parents were "experimenting" with cannabis dosage amounts for K.X.'s and thus concluded that a warrant was necessary because there was probable cause to believe that parents failed to consult with a medical professional for treating autism with cannabis oil.

In regard to the statements of K.X.'s behavior, Defendant Olarte testified at her deposition that she spoke with Ms. Turner about the DCFS referral.  Ms. Turner reported "other staffs' observations" to Defendant Olarte.  (Olarte Depo p. 90:24-25.)  Ms. Turner testified during her deposition that an aide reported to her that K.X. was "stumbling."  (Turner Depo p. 52:10; 93:23-94:1)  Although the SOC describes the statements as though Ms. Turner observed them first-hand, she testified that she did not observe the conduct but the conduct was relayed to her by staff.  The evidence supports the fact that the statements were made and K.X.'s conduct was observed by other staff at the school.  Defendant Olarte testified that she "attempted to engage [K.X.]," "asked what her name was, how old she was, asked how she was doing," but K.X. did not respond.  Defendant Olarte also testified that she asked Ms. Turner whether K.X. was non-verbal and was told that K.X. was "essentially nonverbal, with the exception of a few words."   Plaintiffs argue that Defendant Olarte's statements about Plaintiff Scanlon "quick[ly] flash[ing]" the bottle was false; however, Defendant testified that she was not given the bottle to hold.

The alleged misrepresentations, omissions, and false statements listed in Plaintiffs' Opposition are not material to finding that there was probable cause to remove the minors from parents' custody and Plaintiffs failed to prove otherwise.

1

2                            **b. Defendant Gonzales**

3            Defendants argue that summary judgment is appropriate as to Defendant

4    Gonzales because she cannot be held liable for the alleged misconduct of another

5    Defendant.  Plaintiffs contend that Defendant Gonzales failed to verify any of the

6    representations in the SOC and such failure amounted to culpable inaction in the

7    training or supervision of Olarte.

8            "Although there is no pure respondeat superior liability under § 1983, a

9    supervisor is liable for the acts of his subordinates if the supervisor participated in

10   or directed the violations, or knew of the violations [of subordinates] and failed to

11   act to prevent them."  *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d

12   1175, 1182 (9th Cir. 2007) (internal quotation marks omitted).  In other words,

13   supervisory liability under § 1983 attaches if there exists either "(1) his or her

14   personal involvement in the constitutional deprivation, or (2) a sufficient causal

15   connection between the supervisor's wrongful conduct and the constitutional

16   violation."  *Rodriguez v. City of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018).

17           Here, it is undisputed that the warrant package included a SOC signed by

18   Defendant Olarte on September 26, 2017.  (Pang Decl. ¶ 7(b); SUF ¶¶ 33, 77.)  In

19   her deposition, Supervisor Gonzales testified that she read the SOC before it was

20   submitted to the court and did not verify the representations Olarte attributed to

21   the minors' teachers.  (Depo. Gonzalez 87:12-22., Dkt. 134-13.)  Supervisor

22   Gonzalez also stated that when reviewing SOCs, she checks the veracity of the

23   allegations "with the person who was making the allegations . . . in the statement

24   of cause" and relies on the information provided from their investigations.  (Id.

25   88:15-25; SUF ¶ 39.)  Plaintiffs argue that Supervisor Gonzales did not "pick up

26   the phone and [] call [Ms. Turner], nor [sic] call anyone described as 'school staff'

27   in the DCFS documents [submitted to the dependency court] to ask about any of

28

1    the allegations." There is no evidence that Supervisor Gonzalez was required to

2    verify the facts, nor do Plaintiffs support their position with case law.

3        Having found no material misrepresentations, false statements or omissions,

4    the Court finds no evidence to support supervisor liability.

5    **2.    Third Cause of Action: Substantive Due Process Right to be Free**

6    **from Deception**

7        Plaintiffs' third cause of action is based on deception and the right to

8    familial association under the Due Process Clause of the Fourteenth Amendment.

9    Defendants did not brief Plaintiffs' substantive due process claim. Defendants

10   briefed a procedural due process claim that is not included in Plaintiffs' FAC.

11   However, having found no material misrepresentations, omissions or false

12   statements, the third cause of action also fails.

13   **3.    Fifth Cause of Action: *Monell* Claim against Defendant County of**

14   **Los Angeles**

15       Plaintiffs state Defendants have an unofficial policy or custom not requiring

16   social workers to include exculpatory evidence in their filings and reports and

17   argue that Defendants do not have discipline policies to address the failure to

18   include exculpatory evidence. Defendants argue that the County has customs and

19   practices regarding honesty and integrity in report writing.

20       Municipalities may be held liable under 42 U.S.C. § 1983 if pursuant to

21   official municipal policy of some nature, the municipality caused a constitutional

22   tort. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). In order to prevail

23   on a *Monell* claim, plaintiff must establish: "(1) that he possessed a constitutional

24   right of which he was deprived; (2) that the municipality had a policy; (3) that this

25   policy 'amounts to deliberate indifference' to [plaintiff's] constitutional right; and

26   (4) that the policy is the 'moving force behind the constitutional violation.'" *Boss*

27   *v. City of Mesa,* 746 Fed. Appx. 692, 695 (9th Cir. 2018).

28

In this case, Defendants' evidence to support its custom and practices regarding honesty and integrity in report writing includes Harold Winter's deposition, in which he stated that the County has a practice that social workers should include any mitigating facts to a proposition that a child should be removed.  Winter also stated that the department has a practice during the review of the SOC by the supervisor that "if there was information that was relevant that was missing [in the SOC], [the SOC] should be returned to the social worker to correct."  (Depo. Winter 63:9-20, Ex. 20, Dkt. 137-2.)  Defendants' evidence also includes Defendant Gonzalez's deposition, stating that as a supervisor she is required to "review every document that a social worker under [her] intends to submit to the court" and that "a social worker who is writing a report . . . must report honestly."  (Depo. Gonzalez 32:23-33:2, Ex. 10, Dkt. 134-13.)

To support its argument, Plaintiffs cite to Harold Winter's deposition, which states that he had "become aware of situations" where there were misrepresented information in documents prepared by social workers.  (Depo. Winter 38:13-25, Ex. 20, Dkt. 137-2.)  Plaintiffs rely on *Kirkpatrick v. Cnty. of Washoe*, 792 F.3d 1184, 1201 (9th Cir. 2015), where the Circuit denied summary judgment because the social workers stated in their deposition that "[i]t was not a general practice . . . to get a warrant" before removing a minor from their parents' custody.  *Id.*  The Circuit found that the social workers "should have known the constitutional standard for removing a child [requires a warrant if there is reasonable cause to believe that the child is in imminent danger of serious bodily harm]."  *Id.*  In contrast, Defendants actually obtained a warrant before removal.  Further, Defendants' "aware[ness] of situations" involving misrepresentation does not create an inference of an unconstitutional, unofficial custom or practice.  *Id.*

1        **4.**     **Sixth Cause of Action: Intentional Infliction of Emotional**

2   **Distress ("IIED")**

3        Defendants argue that because the alleged omissions and/or inaccuracies do

4   not amount to outrageous behavior, Plaintiffs' IIED claim should be granted in its

5   favor.  Plaintiffs argue that the alleged omissions or misrepresentations amount to

6   outrageous behavior that exceeds "all bounds of that usually tolerated in a

7   civilized community."

8        To prove an IIED claim, Plaintiffs must establish: "(1) that the defendant's

9   conduct was outrageous, (2) [] the defendant intended to cause or recklessly

10  disregarded the probability of causing emotional distress, and (3) [] the plaintiff's

11  severe emotional suffering was (4) actually and proximately caused by defendant's

12  conduct." *Austin v. Terhune*, 367 F.3d 1167, 1172 (9th Cir. 2004).  Outrageous

13  conduct is that "which goes beyond all possible bounds of decency so as to be

14  regarded as atrocious and utterly intolerable in a civilized community." *Burke v.*

15  *City of Santa Monica*, No. CV 09-02259, 2010 U.S. Dist. LEXIS 153525, at *63

16  (C.D. Cal. Dec. 8, 2010).  Here, the minors were removed from their parents'

17  custody and placed in foster care on September 28, 2017.  (SUF ¶¶ 46, 50.)  The

18  minors were placed back in their parents' custody on October 3, 2017, and the

19  case was dismissed with prejudice in December 2017.  (SUF ¶¶ 56, 57.)

20       Having found that Defendants met their burden of showing that the warrant

21  package did not contain material misrepresentations, false statements or

22  omissions, the violation of the parents' and K.X.'s constitutional rights based on

23  removal of K.X. fails.

24  **B.**     **G.X., Plaintiff Scanlon and Plaintiff Sawyer**

25       Plaintiffs concede the THC bottle was not in a lockbox as of September 15,

26  2017, the day Defendant Olarte visited Plaintiffs' home. (Statement of Genuine

27  Disputes, #119, dkt. 151).  Defendant Olarte testified that during the September

28  19, 2017, meeting Plaintiff Scanlon "never mention anything" about purchasing a

security lockbox.  (Depo. Olarte, Ex. G, 100:21-101:7.)  Plaintiff Scanlon testified that during the meeting she told the social workers that she "had already bought a lockbox" and was told the lockbox was no longer an issue.  (Depo. Scanlon, Ex. K, 256:8-18.)[4]  There is a genuine dispute as to a material fact of whether parents told the social workers that they had already purchased a lockbox at the September 19, 2017, meeting, before the warrant package was filed with the dependency court, but that statement was not included in the SOC.  A reasonable jury could find that failure to include that parents told the social workers that they purchased a lockbox constitutes a material omission to the finding of probable cause for the removal of G.X. with reckless disregard for the truth.

## V. CONCLUSION

Accordingly, the Court **grants** Defendants' motion in its entirety as to the violation of the parents' and K.X.'s constitutional rights based on removal of K.X.

The Court **grants** Defendants' motion on Plaintiffs' Fifth cause of action as to the violation of the parents' constitutional rights based on removal of G.X.

The Court **denies** Defendants' motion on Plaintiffs' Second, Third, and Sixth cause of action as to the violation of the parents' and G.X's constitutional rights based on removal of G.X.


**IT IS SO ORDERED.**


DATED: May 21, 2021


_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

---

[4]  Plaintiff Scanlon also stated the box was purchased "the next day," after the meeting.  (Depo. Scanlon, Ex. K, 255:12-18.)[4]